UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MICHELLE FRAKES, )<br>)<br>Plaintiff )<br>)<br>v. )<br>)<br>PEORIA SCHOOL DISTRICT NO. 150, )<br>An Illinois Local Governmental Entity, )<br>)<br>Defendant. ) | Case No.: 12-1329 |

## O R D E R AND OPINION

Defendant, Peoria School District No. 150 ("District 150") has moved for summary judgment [46]. The parties have fully briefed the Motion and Response. For the reasons set forth below, Defendant's Motion for Summary Judgment [46] is GRANTED.

### STATEMENT OF FACTS

As an initial matter, the Court notes Plaintiff's response to Defendant's Statement of Undisputed Material Facts has several deficiencies. For example, Defendant's Undisputed Material Fact No. 4 states, "During her time at Day Treatment, Plaintiff taught students with behavioral and emotional disorders in grades 5, 6, 7, and 8." Local Rule 7.1 (D)(2)(b) requires Plaintiff to either admit the matter or dispute the matter because Plaintiff did not teach grades 5, 6, 7, and 8. If Plaintiff wished to dispute the matter, the Local Rules requires Plaintiff to cite evidentiary authority supporting the dispute.

Here, Plaintiff's counsel chose to dispute Fact No. 4, not because Plaintiff did not teach students, grades five through eight, with behavioral and emotional disorders, but rather because Defendant did not quantify the degree of teaching those with behavioral and emotional disorders and all accompanying difficulties in doing so. In addition, in response to some of Defendant's

undisputed facts Plaintiff states, "Plaintiff admits this matter, but has listed it as disputed." Plaintiff cannot admit a matter then list is as disputed for some other reason.

This failure to follow the Local Rules requires the Court to do an extensive scouring of the record to determine if these are actual disputed facts or simply undisputed facts with a supplemental explanation from Plaintiff's counsel, which would be more appropriately laid out in Plaintiff's Statement of Additional Material Facts. While there may be some legitimate rationale to Plaintiff's counsel's actions, using this method as an attempt to survive summary judgment is not appropriate. When Plaintiff unnecessarily lists facts that are undisputed as disputed or states that a fact is "admitted, but its not" it makes it difficult for the Court to identify which facts are actually in dispute. Accordingly, the Court will not consider Plaintiff's supplementary explanation to any admitted fact.  In addition, the Court will deem admitted any facts Plaintiff stated are "admitted, but disputed".[1]

Local Rule 7.1(D)(3) states that a Defendant may only respond to the Additional Material Facts section of Plaintiff's response. While Plaintiff's counsel provided supplementary explanations throughout his brief, he failed to include any Additional Material Facts.  As a result, the Court is now considering a Motion for Summary Judgment where very few facts are in dispute.

The Court notes that Plaintiff's counsel has briefed summary judgments in this manner in numerous cases where he is listed as counsel-of-record.[2] To avoid a repeat of this colloquy in the future, the Court recommends that Plaintiff's counsel review Local Rule 7.1(D)(2).

---

[1] Defendant's Undisputed Material Facts No. [4-8, 13-17, 31, 38, 41-43, 45-48, 50, 52-53, 55, 58-65] will be deemed admitted for aforementioned reasons.
[2] See Walowski v. Wal-Mart Stores, Inc., 2014 WL 7365933, Docket Entry No. 37 (C.D. Ill. Dec. 23, 2014); Lawler v. Peoria Sch. Dist. No. 150, 2015 U.S. Dist. LEXIS 104280, Docket Entry No. 69 (C.D. Ill. Aug. 10, 2015); Hooper v. Proctor Healthcare, Inc., Case No. 12-cv-01005, Docket Entry 19 (C.D. Ill. July 7, 2014)

Michelle Frakes ("Frakes") began working as a special education teacher in District 150 in August 2002 and remained employed until her discharge in May 2012. From August 2002 until June 2006, Frakes worked at Trewyn Middle School and Blaine-Sumner school. Frakes worked as a sixth grade cross-categorical, which means she taught special education students with various forms of disabilities in one room. Frakes taught at the Day Treatment in Trewyn School from August 2006 until she went on medical leave on April 11, 2012, where she again taught students, grades five through eight, with behavioral and emotional disorders. During her last year at Trewyn, Frakes had approximately six to eight students in her classroom.

The Day Treatment program serves children with behavioral and emotional disorders, which include Attention Deficit/Hyperactivity Disorder, schizophrenia, bipolar disorder, and other conditions. Students with behavioral and emotional disorder that require a structured environment with a large number of interventions and supports are removed from their regular school and placed at Day Treatment at the recommendation of the child's Individual Education Plan ("IEP") team.

All students in Day Treatment were eligible for special education services pursuant to the Individuals with Disabilities Education Act ("IDEA") and therefore had both an IEP and a Behavioral Intervention Plan ("BIP"). A BIP is plan which lays out how teachers and paraprofessionals will deal with students who exhibit extreme behaviors. The required members of an IEP team include a special education teacher, a school or district administrator, and the student's parents. IEPs include information about the student, goals for the school year, testing results, current levels of performance and achievement, as well as accommodations and modifications. The IDEA leaves classroom practices to local control.

During the 2011-2012 year, none of the parents with students in Day Treatment filed an IDEA complaint or any other type of complaint, which would be the proper forum to allege a

violation of a student's IDEA or Section 504 rights. Plaintiff never voiced any concerns indicating the District or the Day Treatment's practice and procedures violated her students' rights nor did she object to anything within her students' IEPs and BIPs even though she was present at the meetings.

As a special education and classroom teacher, Frakes was responsible for drafting a proposed IEP prior to the student's annual IEP review. As the classroom teacher, Frakes was in the best position to know her student's present levels of performance, progress towards the student's IEP goals, and what accommodations and modifications were most effective. At the IEP meeting, the full IEP team would discuss the proposed IEP.

During the 2006-2007 and 2007-2008 school years, Shannon Marlin ("Marlin") was the Special Education Coordinator of the Day Treatment Center and supervised and evaluated Frakes. During this time period, Marlin was a qualified administrator with a Type 75 administrator's certification qualifying her to evaluate teachers and she was also certified to teach special education.

In Plaintiff's 2006-2007 school year performance evaluation, Marlin gave Frakes a satisfactory rating. However, Marlin noted the following deficiencies in Frakes performance: "Ms. Frakes has extreme difficulty adjusting to the behavior of her special needs students. She has failed to establish firm, fair, and consistent communication parameters for student classroom behavior. Ms. Frakes' classroom is unorganized and in disarray. . .Disruptive behavior is not managed constructively." Docket Entry 47-10, Ex. 10, 2007 Evaluation by Marlin. Marlin's evaluation also noted that Frakes would be observed several times during the school year to ensure that she was improving.

Marlin gave Frakes' an unsatisfactory rating in her 2007-2008 evaluation and noted the following deficiencies in Frakes' performance, among others: "Ms. Frakes has had a very

4

challenging and ineffectual year. There are many concerns with her performance as a teacher." Frakes had "extreme difficulty adjusting to the behavior of her special needs students" and had "failed to establish firm, fair, and consistent communication parameters for student classroom behavior." Marlin noted "there has still been no improvement in the area of classroom management . . . students actively engaged, and the teacher up moving around the room monitoring students." Docket Entry 47-11, Ex. 11, 2007 Evaluation by Marlin. After her unsatisfactory rating, the District placed Frakes on a remediation plan and she was evaluated two additional times during the 2007-2008 school year.  During those additional evaluations, Marlin noted that Frakes' deficiencies continued and Frakes received an unsatisfactory evaluation rating on August 28, 2008 and June 6, 2008.

Mary Camp ("Camp") became the Special Education Coordinator Education Coordinator at Day Treatment, and, consequently, became Plaintiff's supervisor. Camp had never evaluated teachers prior to becoming the Special Education Coordinator at Day Treatment.  Although, Camp gave Frakes satisfactory evaluations for the 2008-2009, 2009-2010, and 2010-2011 school years, Camp's evaluations also noted deficiencies in Frakes' performance. For example, in her 2009 evaluation, Camp wrote "[d]ata shows she has been at her desk as much as 75% of the time reading shopping material, playing games on the computer, and preparing material that should be done during her prep. This interferes with the success of her classroom." Docket Entry 47-14, Ex. 14, 2009 Evaluation by Camp.

In Frakes' 2009-2010 evaluation, Camp again noted "She spends too much time texting on her phone and preparing material that should be done during her prep. She requires constant supervision to meet district expectations, fulfill the vision and mission of the schools, and implement the school wide behavior systems." Docket Entry 47-15, Ex. 15, 2010 Evaluation by Camp.  In her 2010-2011 evaluation, Camp again noted that Plaintiff had severe performance

5

deficiencies by writing: "She tries to prevent discipline problems, but sometimes little things escalate into big problems. She has a limited disciplinary repertoire." Camp noted that Frakes was having severe performance deficiencies. "I want her to avoid sitting at the computer during independent work time." Camp also noted that Plaintiff "needs to meet required deadlines for written reports, report cards, IEPs, and other requested information." Docket Entry 47-16, Ex. 16, 2010 Evaluation by Camp.

During the 2011-2012 school year as a result of a change in Illinois law, the District introduced a four-tiered evaluation rating of "Excellent," "Satisfactory," "Needs Improvement," and "Unsatisfactory" in four schools. In 2012-2013, the District adopted the four-tiered evaluation rating for all teachers. During the 2010-2011 evaluation, in order to prepare Frakes for the four-tiered review process Camp gave Frakes specific areas to improve on. Although the rating was not available in 2010-2011, Camp viewed Frakes as a "Needs Improvement" teacher. Specifically, Camp believed that Frakes did not have a passion for teaching students with behavioral and emotional disorders, which showed in Frakes' teaching. In addition, Camp observed that every year after evaluations, Frakes' performance would go downhill for the remainder of the school year.

In October of the 2011-2012 school year, Carolyn Nunn ("Nunn") became the Assistant Principal of Day Treatment and therefore became Frakes' evaluator. Prior to joining Day Treatment, Nunn had worked as a Speech-Language Pathologist for the District for 18 years and also served as an Assistant Principal and Interim Principal for the District. Nunn had the requisite qualifications to evaluate Frakes' performance.

During the 2011-2012 school year, Nunn observed Frakes, both formally and informally. Nunn observed several deficiencies in Frakes' teaching practice and in her performance of her professional duties. Frakes struggled to come to IEP meetings with completed IEP proposal, as she

6

was directed and as was her responsibility. Both Camp and Nunn noted these deficiencies. Throughout the 2011-2012 school year, Nunn provided Frakes feedback on how to improve her classroom management and instruction. For example, Nunn gave Plaintiff written and internet sources on classroom management and discipline. Nunn also recommended that Frakes use tape on the classroom floor to designate the location of students' desks in order to increase organization. Frakes testified that she had "no reason to disagree with" Nunn's feedback, prior to receiving her 2012 evaluation and Frakes attempted to implement such feedback, but with limited success. Nunn also arranged for Frakes to observe other teachers to assist her in improving her classroom management.

On February 1, 2012, Nunn evaluated Frakes. Nunn noted the follow deficiencies in Frakes' performance: 1) She led the building Professional Development, but her review of Thinking Maps was foggy, leaving teachers with more questions than answers about their use. 2) Frakes failed to meet deadlines with respect to special education students. She arrived at IEP meetings on more than one occasion without complete and accurate paperwork causing the IEP team meeting to reschedule, which in turn caused the IEP meetings to be rescheduled as well. 3) Frakes did not conduct progress monitoring and collect data for her students every two weeks as required. For example, Frakes only had three data points for one student for an 18-week period of time. 4) Frakes was frequently late for work and would leave her class unattended. 5) Frakes failed to create a safe and predictable classroom and her classroom was chaotic. Students disrespected her and called her names and Frakes allowed it against Nunn's advice. Students would also get out of their seats, walk around the room, invade Frakes' and the teacher's assistant's desk, and at times walk out the room. 6) Frakes was unprepared for class because her PowerPoints were not working properly and at times had the wrong answers. Docket Entry 47-17, Ex. 17, 2012 Evaluation by Nunn. As the result of the abovementioned deficiencies, Nunn gave Frakes an unsatisfactory rating on February 1, 2012.

Frakes refused to sign the evaluation and her refusal to do was her only act of protest or opposition to any alleged unlawful acts or practices by the District.

Frakes wrote a document entitled "Points for Rebuttal" to her February 1, 2012 review and delivered it to Human Resources. She felt her review was unfair because for several reasons. She felt that her technology issues interfered with her "Thinking Maps", in-class instruction, and her ability to prepare proposed IEP prior to an IEP meeting. Further, Frakes stated her review was unfair because she did not have notice that she was expected to prepare a proposed IEP by a specific deadline and other teachers came to IEP meetings without the proper paperwork. Frakes admitted in her rebuttal that she is "first to admit that I need to improve my job performance, however, do we really want perfect teachers teaching our kids…She just did not feel I had a handle on classroom management. I admit I at times struggle with this." Docket Entry 47-19, Ex. 19, Rebuttal by Frakes. At no point during in her Points for Rebuttal did Frakes mention her students' rights, any acts of Plaintiff's advocacy for her students, or the methods of teaching she utilized were better for her disabled students.

After her receipt of the unsatisfactory review, the District placed Frakes on a remediation plan that provided Frakes with direction for her improvement in the areas of deficiency set forth in her evaluation. Before the remediation period could commence, Frakes went out on medical leave for the remainder of the school year due to a health condition. On April 9, 2012, Frakes was honorably discharged at the end of the 2011-2012 school year as a part of a reduction-in-force ("RIF"). Frakes was notified of her honorable dismissal on April 10, 2012.

On August 28, 2012, Frakes filed the current Complaint against the District alleging the District dismissed Frakes in retaliation for, or interfered with, Frakes' aiding her students with their rights. On September 4, 2012, Frakes filed a complaint in the Circuit Court of Peoria County alleging she was improperly dismissed on the basis of her unsatisfactory evaluation

8

rating. On April 25, 2013, the Circuit Court granted the District's Motion for Summary Judgment. Frakes appealed to the Illinois Appellate Court, Third District. The Illinois Appellate Court affirmed. Frakes filed a petition for leave to appeal the Appellate Court decision to the Illinois Supreme Court. On November 26, 2014, the Illinois Supreme Court denied the petition.

## DISCUSSION

### I. Legal Standard

A motion for summary judgment will be granted where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The moving party has the responsibility of informing the Court of portions of the record or affidavits that demonstrate the absence of a triable issue. Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 2552 (1986). The moving party may meet its burden of showing an absence of material facts by demonstrating "that there is an absence of evidence to support the non-moving party's case." Id. at 2553. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S. Ct. 2505, 2513 (1986); Cain v. Lane, 857 F.2d 1139, 1142 (7th Cir. 1988).

If the moving party meets its burden, the non-moving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1355-56 (1986). Federal Rule of Civil Procedure 56(e) requires the non-moving party to go beyond the pleadings and produce evidence of a genuine issue for trial. Where a proposed statement of fact is supported by the record and not adequately rebutted, a court will accept that statement as true for purposes of summary judgment; an adequate rebuttal requires a citation to specific support in the record. Drake v. Minnesota Mining & Mfg. Co., 134 F.3d 878, 887 (7th Cir. 1998). Celotex Corp., 106 S. Ct. at 2553. This Court must then determine whether there is a need for trial --

whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may be reasonably resolved in favor of either party. Anderson, 106 S. Ct. at 2511; Hedberg v. Indiana Bell Tel. Co., 47 F.3d 928, 931 (7th Cir. 1995).

## II.    ANALYSIS

As an initial matter, the Court notes that Plaintiff asserts that she did not bring a retaliation claim. Accordingly, the Court finds no need to address the Defendant's motion for summary judgment as to retaliation as no retaliation claim exists. However, the Court will address Plaintiff's interference claim.

Under The Americans with Disabilities Act ("ADA") it is unlawful to "coerce, intimidate, threaten or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed, or on the account of his her having aided or encouraged any other individual in the exercise or enjoyment of, any right granted or protected by this chapter." 42 U.S.C. § 12203(b).

The ADA interference provision copies verbatim the interference prohibition in the *Fair Housing Act* ("FHA"). See 42 U.S.C. § 3617. Although the Seventh Circuit has not spoken on this issue of whether the FHA interference standard applies to ADA claims, the parties agree that the FHA interference standard is the proper framework to address an ADA interference claim. Further, at least one Court of Appeals has stated that the FHA interference standard is applicable to ADA interference claims. See Brown v. City of Tucson, 336 F. 3d 1181, 1191 (9th Cir. 2003)(the ADA and the FHA are not merely similar, but identical, and that "similarities between statutory provisions are an indication that Congress intended the provision to be interpreted the same way *citing* Northcross v. Bd. of Educ. of Memphis City Schs., 412 U.S. 427, 428, (1973)). In addition, the House Committee Report on the ADA states, "The Committee intends that the interpretation given by the Department of Housing and Urban Development to a similar

provision in the Fair Housing Act be used as a basis for regulations" for the ADA prohibition on retaliation and coercion. H.R. Rep. 101-485(II)(1990).

In order to survive summary judgment on a ADA interference claim using the FHA framework[3], Frakes must prove that 1) she engaged in protected activity by aiding or encouraging her students in the exercise of their ADA or §504 rights; 2) the District coerced, intimidated, threatened, or interfered "on account" of Frakes' protected activity under the ADA or §504; and 3) the District intended to discriminate against her. The Court finds that Frakes claim fails on the first prong of the ADA interference analysis. Accordingly, Defendant is entitled to summary judgment.

**Protected Activity**

The primary issue in this case is whether Frakes took an action to protect the rights of her students with disabilities. Frakes argues that her "action" in this case was continuing to teach in a manner that she felt better-served the special needs of her students and was more consistent with the Rehabilitation Act, 29 U.S.C. §794(a). The gravamen of Frakes' argument is that Nunn's negative review, which led to Frakes' termination, interfered with Frakes ability to provide a free and public education ("FAPE") to her disabled students pursuant to the ADA. Plaintiff essentially argues that Nunn did not have the requisite knowledge of BED students and their educational requirement; therefore, her negative review of Frakes' teaching methods interfered with BED's student right to FAPE.

It is undisputed by the parties that students with disabilities, such as the ones taught by Frakes, are entitled to a FAPE. However, it is well-settled in the Seventh Circuit that schools are

---

[3] In order to survive a motion for summary judgment on a FHA interference claim, the plaintiff must present evidence that: (1) she engaged in protected activity; (2) she was engaged in the exercise or enjoyment of her fair housing rights; (3) the defendant coerced, intimidated, threatened, or interfered with the plaintiff on account of her protected activity under the FHA; and (4) the defendant intended to discriminate. Bloch v. Frischholz, 587 F.3d 771, 783 (7th Cir. 2009); see East-Miller v. Lake Cnty Highway Dep't, 421 F.3d 558, 563 (7th Cir. 2005) ("We hold that a showing of intentional discrimination is an essential element of a § 3617 claim.").

not required to provide students with disabilities with a particular or best teaching methodology or an individualized plan, but rather the school must be in compliance with IDEA and §504 of the ADA in providing students with a FAPE. See Lachamn v. Ill. State Bd. Of Educ., 852 F. 2d 290, 297 (7th Cir. 1988); CTL ex rel. Trebatoski v. Ashland Sch. Dist., 743 F.3d 524,528 (7th Cir. 2014).

Fatal to Frakes' claim is that it is undisputed that Nunn had both the qualifications and ability to evaluate Frakes' performance. See Pl.'s Resp. Mot. Summ. J. ¶¶ 42, 43, 44. Furthermore, Plaintiff's objections to Nunn's qualifications is a red herring as Frakes testified that prior to Nunn's 2012 unsatisfactory evaluation, Frakes had no reason to disagree with Nunn's recommendations. Despite her current argument that she had the best teaching methodology for her students, Frakes testified that she tried to implement Nunn's feedback. Further dispositive of this issue is the testimony from Frakes' own expert, Dr. Blum, who testified that none of Nunn's recommendations violated the IDEA or interfered with Frakes' ability to teach her students. In fact, Dr. Blum testified that some of the recommendations made by Nunn would have aided Frakes' ability to teach her disabled students.

In addition, Frakes' own written statements, testimony, and inaction extinguishes her claim that her teaching methods better-served her disabled students. Despite the fact that Frakes received negative feedback of a similar nature in all her evaluations, regardless of who the evaluator was, it is undisputed that Frakes never raised any concerns that the District was attempting to force her to teach in a way that violated her students' rights to a FAPE. Although Frakes, as a special education teacher, was in the best position to evaluate and monitor her students, she never raised any objections to anything listed in her students' IEPs or BIPs. In response to her 2012 evaluation, Frakes submitted a "Points for Rebuttal" document. It is undisputed that nowhere in the rebuttal did Frakes advocate for the rights of her students or state

that her teaching methods were better for her students. To the contrary, Frakes admitted that she needed to improve her job performance and that she struggled with classroom management. These statements alone contradict Frakes' argument that she was engaged in the protected activity of teaching in a way the best-served her disabled students.

The Court finds that the undisputed facts establish that Frakes did not engage in a protected activity as the record is devoid of any evidence that Frakes advocated for her students and notified the District that she was attempting to teach in a way that better-served her students. In addition there is no credible evidence suggesting that the District interfered with Frakes' ability to teach as the testimony of Frakes and her expert contradict this. Frakes has failed to satisfy the first prong of the ADA interference standard; therefore, the District is entitled to summary judgment and the Court need not address the District's remaining arguments.

## CONCLUSION

For the reasons set forth above, Defendant Peoria School District No. 150's Motion for Summary Judgment [46] is GRANTED. This matter is now terminated, and existing deadlines are vacated.

Entered this 26th day of August, 2015.

/s/ James E. Shadid
James E. Shadid
Chief United States District Judge